

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DALE GARRISH, et al.,

               Plaintiffs,       CIVIL CASE NO. 00-40291

v.

UNITED AUTOMOBILE, AEROSPACE,    HONORABLE PAUL V. GADOLA
AND AGRICULTURAL IMPLEMENT       U.S. DISTRICT JUDGE
WORKERS OF AMERICA,
INTERNATIONAL UNION (UAW), UAW
LOCAL 594, GENERAL MOTORS
CORPORATION, a public
corporation incorporated in
the State of Delaware, GORDON
CAMPBELL, and TODD FANTE,
jointly and severally,


               Defendants.
_____/


### MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Before the Court are motions for summary judgment filed by Defendant General Motors Corporation and Defendants UAW and UAW Local 594. Defendants seek summary judgment on the issue of the statute of limitations only. The Court heard oral argument on June 25, 2003. For reasons set forth below, the Court shall grant Defendants' motions.

## I.   BACKGROUND

Plaintiffs are employees of Defendant General Motors Corporation ("GM") at its Truck and Bus facility in Pontiac, Michigan ("GM Truck and Bus").  Plaintiffs are also members of Defendant United Automobile Aerospace and Agricultural Implement Workers of America, International Union ("UAW") and UAW Local 594 ("Local 594"), (collectively, the "Union").  Defendants UAW and GM are parties to a National Collective Bargaining Agreement ("NCBA"). The NCBA concerns Plaintiffs' employment rights, including wages, hours of employment, and working conditions.  Defendant Local 594 and the facility are parties to a Local Collective Bargaining Agreement ("LCBA"), which allows them to negotiate matters not covered by the NCBA.

In early 1997, Local 594's Shop Committee was involved in renegotiating the LCBA with GM management at GM Truck and Bus. Directing Local 594's efforts in the renegotiation was the Chairman of the Shop Committee, Jay Campbell.  Assisting Jay Campbell was Donny Douglas, an employee of the UAW assigned to the UAW's GM Department.   The 1997 negotiations involved the settlement of specific written demands and grievances.

On April 23, 1997, the members of Local 594 at GM Truck and Bus went on strike over these demands and grievances.  The strike

2

lasted 87 days, ending on July 21, 1997. Plaintiffs allege that, although GM met all legitimate demands of Local 594 within the strike's first month, Defendant unions fraudulently prolonged the strike for approximately two months for two reasons. First, Plaintiffs allege that the unions sought to obtain roughly $200,000 in "overtime" payments from GM to high-level officials of Local 594. Second, Plaintiffs allege that the unions sought to obtain employment at GM for two individuals, Gordon Campbell and Todd Fante. Plaintiffs allege that Gordon Campbell is the son of Shop Committee Chairman Jay Campbell and that Todd Fante is the son of a friend of UAW representative Donny Douglas.

According to Plaintiffs, GM ultimately paid $200,000 to Local 594 to be divided among its high-level union representatives. Plaintiffs allege that GM knew this payment was illegal, and that GM nonetheless provided the $200,000 as a means of paying the union leaders to end the strike. Allegedly, at least three members of Local 594's executive board shared in the disbursement of the improperly-obtained $200,000.

GM ultimately agreed to hire Gordon Campbell and Todd Fante as journeymen in skilled trades positions. Plaintiffs allege, however, that these individuals were not qualified journeymen and

3

that GM's agreement to hire them was a violation of the NCBA.[1]

Plaintiffs filed this action on August 7, 2000. Plaintiffs filed a First Amended Complaint on October 4, 2000 pursuant to Section 301 of the Labor Management Relations Act, as amended, 29 U.S.C. § 185 ("Section 301"). Plaintiffs assert the following counts in the First Amended Complaint. In Count I, Plaintiffs claim that all Defendants colluded in violation of the LMRA to violate Plaintiffs' contractual rights under the NCBA by arranging for the hiring of Todd Fante and Gordon Campbell. In Count II, Plaintiffs allege that Defendants UAW and Local 594 committed fraud and collusion in violation of the LMRA to extort the $200,000 "overtime" payment from GM. In Count III, Plaintiffs allege that Defendants UAW and Local 594, in violation of the LMRA, breached the duty of fair representation that they owed Plaintiffs by prolonging the strike in order to obtain employment for Todd Fante and Gordon Campbell.

In its order of March 7, 2001, the Court construed Plaintiffs' First Amended Complaint as asserting one "hybrid" cause of action under Section 301. See Garrish v. UAW, 133 F. Supp. 2d 959, 964 (E.D. Mich. 2001) (Gadola, J.). In its order of July 2, 2001, the

---

[1] GM disputes Plaintiffs' claim that a breach of the NCBA occurred when GM "agreed" to hire Fante and Campbell and maintains that no breach could have occurred until these individuals were actually hired.

4

Court denied without prejudice Plaintiffs' motion for class certification. See Garrish v. UAW, 149 F. Supp. 2d 326, 333 (E.D. Mich. 2001) (Gadola, J.). On July 31, 2002, the Court conducted a status conference with the parties regarding statute of limitations issues. This conference resulted in a stipulated order entered by the Court on August 9, 2002 permitting Defendants to file motions for summary judgment on the issue of the statute of limitations. Defendants filed such motions, and those motions are now before the Court.

## II. LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Martin v. Ohio Turnpike Commission, 968 F.2d 606, 608 (6th Cir. 1992).

5

In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party.  60 Ivy Street Corp. v. Alexander, 822 F.2d 1432, 1435 (6th Cir. 1987).  The Court is not required or permitted, however, to judge the evidence or make findings of fact.  Id. at 1435-36.  The moving party has the burden of showing conclusively that no genuine issue of material fact exists.  Id. at 1435.

A fact is "material" for purposes of summary judgment where proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties.  Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984).  A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Accordingly, where a reasonable jury could not find that the nonmoving party is entitled to a verdict, there is no genuine issue for trial and summary judgment is appropriate.  Id.; Feliciano v. City of Cleveland, 988 F.2d 649, 654 (6th Cir. 1993).

Once the moving party carries the initial burden of demonstrating that no genuine issues of material fact are in dispute, the burden shifts to the nonmoving party to present

6

specific facts to prove that there is a genuine issue for trial. To create a genuine issue of material fact, the nonmoving party must present more than just some evidence of a disputed issue. As the United States Supreme Court has stated, "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted); see Celotex, 477 U.S. at 322-23; Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

Consequently, the nonmoving party must do more than raise some doubt as to the existence of a fact; the nonmoving party must produce evidence that would be sufficient to require submission of the issue to the jury. Lucas v. Leaseway Multi Transportation Service, Inc., 738 F. Supp. 214, 217 (E.D. Mich. 1990), aff'd, 929 F.2d 701 (6th Cir. 1991). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Cox v. Kentucky Department of Transportation, 53 F.3d 146, 150 (6th Cir. 1995).

7

III. ANALYSIS

    A.   STATUTE OF LIMITATIONS IN HYBRID SECTION 301 SUITS

"A hybrid claim under § 301 has two elements: (1) that the employer violated the terms of a collective-bargaining agreement and (2) that the union breached its duty of fair representation." Garrish, 133 F. Supp. 2d at 965 (citations omitted). In order to recover against either the employer or the union, a plaintiff in a hybrid Section 301 suit "must show that the [employer] breached the [collective bargaining] [a]greement and that the [u]nion breached its duty of fair representation." Bagsby v. Lewis Bros., Inc., 820 F.2d 799, 801 (6th Cir. 1987). Accordingly, "[u]nless [the plaintiff] demonstrates both violations, he can not succeed against either party." Id.

A six month statute of limitations applies to hybrid Section 301 claims. DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 169 (1983); Martin v. Lake County Sewer Co., 269 F.3d 673, 677 (6th Cir. 2001); Garrish, 133 F. Supp. 2d at 965. "Such a claim accrues when an employee discovers, or should have discovered with exercise of due diligence, acts giving rise to the cause of action." Wilson v. Int'l Bhd. of Teamsters, 83 F.3d 747, 757 (6th Cir. 1996); accord Martin, 269 F.3d at 678-79. Moreover, "[t]he determination of the accrual date is an objective one: 'the asserted actual

8

knowledge of the plaintiffs is not determinative if they did not act as reasonable persons and, in effect, closed their eyes to evident and objective facts concerning the accrual of their right to sue.'" Noble v. Chrysler Motors Corp., 32 F.3d 997, 1000 (6th Cir. 1994).

Defendants GM, the UAW, and Local 594 argue that they are entitled to summary judgment because Plaintiffs' suit is time barred. Plaintiffs filed this action on August 7, 2000. Therefore, Plaintiffs' suit was timely only if the claims accrued after February 7, 2000. In order to defeat Defendants' motions for summary judgment, Plaintiffs must adduce evidence from which a reasonable jury could conclude that they did not discover, or could not have discovered through the exercise of reasonable diligence, acts giving rise to the cause of action prior to February 7, 2000.

B. **WHETHER PLAINTIFFS KNEW OR SHOULD HAVE KNOW OF THE ACTS GIVING RISE TO THE CAUSE OF ACTION**

In this Court's March 7, 2001 opinion and order, the Court framed two issues comprising Plaintiff's Section 301 claim. First, the Court noted that Plaintiffs allege that GM breached the NCBA by hiring Fante and Campbell and that Union officials breached their duty of fair representation by prolonging the 1997 strike until GM agreed to their hiring demands. See Garrish 133 F. Supp. 2d at 964. Second, the Court noted that Plaintiffs alleged that GM's

9

alleged payment of $200,000 was linked to the Union officials' alleged prolongation of the strike.  <u>See id</u>.  The Court noted, however, that it was not entirely clear whether Plaintiffs had in fact alleged that the $200,000 payment was a breach of contract. <u>See id</u>. at n.2.

In its motion, Defendant GM maintains that Plaintiffs have since conceded that the only alleged act constituting a breach of contract was GM's agreement to hire Todd Fante and Gordon Campbell. In support of this contention, GM cites a May 24, 2002 letter from Plaintiffs' counsel Harold Dunne in which Mr. Dunne wrote, "Any liability that GM may incur stems solely from the claim of the breach of the collective bargaining agreement relative to the hiring of Fante and Campbell" and "GM's liability for hiring Campbell and Fante is founded upon the grievances filed by Garrish, et al." (<u>See</u> GM Ex. 1, Ltr. from Harold Dunne, May 24, 2002.)

However, in Plaintiffs' April 25, 2003 response to the motions for summary judgment, Plaintiffs contend that there are <u>two</u> separate acts which constitute their Section 301 suit. The first act cited by Plaintiffs is GM's hiring of Todd Fante and Gordon Campbell.  The second act cited by Plaintiffs is GM's alleged payoff of Union officials.

Because it is unclear whether Plaintiffs in fact have conceded

10

that GM's liability is limited to the hiring of Fante and Campbell, the Court will address the statute of limitations issue with respect to the predicate acts as framed by the Court in its March 7, 2000 order. Accordingly, the Court now addresses whether, prior to February 7, 2000, Plaintiffs discovered, or should have discovered through the exercise of due diligence, (1) that the Union prolonged the 1997 strike in order to force GM to hire Todd Fante and Gordon Campbell; and (2) that the Union demanded payments from GM and that GM made such payments.

### 1. The Hiring of Todd Fante and Gordon Campbell

There is no dispute that GM hired Todd Fante and Gordon Campbell as journeymen builders on or about August 4, 1997. Defendants GM, the UAW, and Local 594 maintain that Plaintiffs had actual and constructive knowledge of the hiring of Todd Fante and Gordon Campbell as early as August, 1997. Defendants support this contention with a multitude of documents in the form of newspapers, leaflets, petitions, and newsletters in an attempt to show that the hiring of Fante and Campbell was well publicized within Union and its membership at GM Truck and Bus beginning in August, 1997 and continuing through September, 1999. (See GM Br., pp. 9-14; Union Br., pp. 8-29.)

11

First, Defendants note that lead Plaintiff Garrish[2] stated at his deposition that, at the September 14, 1997 membership meeting, Donny Douglas admitted that he had delayed settlement of the 1997 strike in order to get Fante and Campbell hired. (See GM Ex. 14, at 40.)

Second, Defendants cite a leaflet distributed by Suzanne Brown, which describes how Donny Douglas admitted at the September 14, 1997 membership meeting "that he held up the negotiations and kept us out on the picket lines in his effort to get Jay Campbell's boy hired into Engineering." (GM Ex. 13; Union Ex. 11.) The Union also notes that Plaintiff Garrish, in his deposition, admitted that there was a lot of talk about newsletters such as Brown's; Garrish stated that the allegations that Douglas had delayed the settlement of the strike "was a big topic." (GM Ex. 14, at 42.)

Third, Defendants cite a petition entitled "A Petition to Suspend International Servicing Representative Donny G. Douglas From His Assigned Responsibilities to Service Members of UAW Local 594, GM Truck & Bus-Pontiac," which was signed by between 500 and 2000 members of Local 594 and 73 Plaintiffs, including Plaintiff Garrish. (See GM Ex. 21.; Union Ex. 22; Garrish Dep. 56.) The

---

[2] Plaintiffs have identified Dale Garrish, Gene Austin, Janice Austin, and Gerald McDonald as the "lead" plaintiffs in this suit and as the only fact witnesses.

petition states, in part: "The Independent Slate finds itself under attack from those same disgruntled members for it's [sic] misuse of the bargaining table during the '97 strike.  Specifically, the Chairman of the Shop Committee and the Skilled Trades Zone Man receiving grievance settlements that exceeded the yearly incomes of some members and bargaining to get relatives hired who had been declared unsuitable by management."  (GM Ex. 21.; Union Ex. 22; Garrish Dep. 56.)

Fourth, Defendants cite the April 1998 issue of <u>The Challenger</u>, an opposition newspaper published by lead Plaintiff Gene Austin.  In the April 1998 issue, Plaintiff Austin questioned what had kept the members on strike so long, asking, "was it [Jay Campbell's] son being hired . . . ?"  (GM Ex. 24, Union Ex. 33, <u>The Challenger</u>, Vol. 1., No. 7. at 3.)  Defendants note that <u>The Challenger</u> was widely distributed among the members of Local 594.  (<u>See</u> GM Ex. 10, Gene Austin Dep. 217 (noting that "a couple thousand copies" of <u>The Challenger</u> were distributed in the plant; GM Ex. 11, Gerald McDonald Dep., (stating that he distributed between 75 and 100 copies of most if not all of the editions of <u>The Challenger</u>)).

Fifth, Defendants cite a November 1998 issue of <u>The Challenger</u>, in which lead Plaintiff Gene Austin writes: "What kept

13

[the members] out [on strike] the extra months? . . . possibly Jay's son being hired as a skilled trade journeyman without the proper card?"  (Union Ex. 36. at 3.)

Sixth, Defendants note that on June 6, 1999, lead Plaintiff Janice Austin filed an unfair labor practice charge against the Union with the National Labor Relations Board.  In her unfair labor practice charge, Plaintiff Janice Austin alleged that the Union had breached its duty of fair representation during the 1997 strike by negotiating to get relatives of union officials hired.  (See GM Ex. 45, 46.)  The NLRB declined to issue a complaint in the matter, finding in part that the charge was "untimely filed."  (See GM Ex. 47; Union Ex. 1.)

In response, Plaintiffs admit that they "knew the facts of [Fante and Campbell's] wrongful hiring within days of their being hired."  (Pl. Br. at 24.)  Indeed, at oral argument, Plaintiffs' counsel stated at one point, "we agree with GM and the UAW, Plaintiffs knew well before August of 2000 of the facts giving rise to their Complaint.  They knew that.  That's why they filed a grievance in August of 1997."  (Hrg. Tr. 68.)  Thus, Plaintiffs assert that "Defendants' reliance on over 52 exhibits going to pro and con leaflets during the years 1998 and 1999 [is] pointless."  (Pl. Br. at 25.)  Although Plaintiffs characterize the record

14

evidence, outlined above, as "pointless," this evidence indicates quite strongly that Plaintiffs knew, or at least should have known through the exercise of reasonable diligence, that Union officials prolonged the strike in order to secure employment for Gordon Campbell and Todd Fante.

Rather than combat the record evidence, however, Plaintiffs stake their claim upon the fact that they filed grievances in August 1997. Plaintiffs argue that the filing of these grievances tolled the statute of limitations. Defendants assert that Plaintiffs' grievances were futile, and that the statute of limitations cannot be tolled while an employee pursues grievances that are completely futile. Defendants' premise their futility argument upon two primary contentions: (1) Plaintiffs knew or should have known that the Union was no longer adequately pursuing their grievances prior to February 7, 2000; and (2) Plaintiffs' grievances seek relief that is wholly irrelevant to their claims in this lawsuit.

It is undisputed that members of Local 594 filed numerous grievances challenging the hiring of Fante and Campbell beginning in August, 1997. On August 5, 1997, Michael Fitch, a member of Local 594, filed Grievance No. D091556 challenging "the credentials and ability" of Fante and Campbell. (See GM Ex. 2.; Union Ex. 2.)

15

On August 19, 1997, Dale Garrish, Gerald McDonald, and Gene Austin,

three of the four lead Plaintiffs in this case, filed Grievance No.

C006888, which states:

> We challenge credentials of all new hires in Auto Product
> Layout & Development Trade hired after Aug 1, 1997. We
> demand a complete open & honest investigation into their
> credentials & all not meeting Journeyman Requirements be
> removed.

(GM Ex. 3.)   On August 29, 1997, Gene Austin filed two group

grievances.   Grievance No. C006889 states:

> We charge [management] with hiring Gordon Campbell a
> nonqualified [sic] journeyman. We demand a complete open
> & honest investigation into his credentials & if not
> meeting Journeyman requirements be removed.

(GM Ex. 4; Pl. Ex. 17, Attach. A.)   Grievance No. C006890 states:

> We charge [management] with hiring Todd Fante a
> nonqualified [sic] Journeyman[.] We demand a complete
> open & honest investigation into his credentials & if not
> meeting Journeyman Requirements be removed.

(GM Ex. 5; Pl. Ex. 17, Attach. A.)

GM contends that all of the grievances challenging the hiring

of Fante and Campbell were withdrawn on February 6, 1998.   GM

supports this contention with a copy of a February 6, 1998

memorandum from Skilled Trades Zoneman Bill Coffey, in which Mr.

Coffey wrote that he was "withdrawing without prejudice [Grievance

No. D091556], and any and all such grievances which may have been

written challenging" the hiring of Fante and Campbell.   (GM Ex.

16

32.)  GM also cites a January 10, 2001 affidavit by Plaintiff Dale Garrish in support of its argument that the grievances were withdrawn on February 6, 1998.  (See GM Ex. 33, ¶ 15.)  In paragraph 15 of the affidavit cited by GM, Plaintiff Garrish avers that "[b]oth grievances [Nos. C006889 and C006890] were withdrawn on 3 February 1999." (See GM Ex. 33, ¶ 15.)  Plaintiffs contend that Grievance Nos. C006889 and C006890 were withdrawn by Zone Committeeman Dan Kell on February 3, 1999.  (See Pl. Ex. 17, ¶ 13.)  Viewing the evidence in the light most favorable to Plaintiffs, the Court presumes that Grievance Nos. C006889 and C006890 were withdrawn on February 3, 1999.  Plaintiff Gerald McDonald testified at his deposition that Grievance No. C00688 had been withdrawn. (McDonald Dep. 56.)  Although Plaintiff McDonald did not state the specific date that his grievance was withdrawn, his testimony implies that the withdrawal occurred sometime in 1999.  (See id. (noting that he became "completely uninvolved" after the withdrawal of his grievance, and that he became involved again during the appeal toward the end of 1999).)

In any event, on February 23, 1999, Plaintiff Garrish appealed the withdrawn Grievance Nos. C006889 and C006890.  (See Pl. Ex. 17, ¶ 15.)  On March 30, 1999, Plaintiff Garrish's appeal was denied as untimely by Carl Forester, Vice-Chairman of the Local 594 Shop

17

Committee. (See Pl. Ex. 17, ¶ 16.) On April 21, 1999, Plaintiff Garrish wrote a letter to Shop Chairman Jay Campbell indicating his intent to appeal to the membership of Local 594. (See Pl. Ex. 17, ¶ 17.) Plaintiff Garrish received no response from Jay Campbell. (See Pl. Ex. 17, ¶ 18.) On July 21, 1999, Plaintiff Garrish again appealed the withdrawal of the two grievances to the membership of Local 594. (See Pl. Ex. 17, ¶ 18; GM Ex. 39.) In a letter dated October 19, 1999, the Recording Secretary of Local 594, Marcus Hamilton, informed Plaintiff Garrish that his appeal was untimely but stated further that he could further appeal the withdrawal of his grievance at a November 7, 1999 membership meeting. (See Pl. Ex. 17, ¶ 19; GM Ex. 40.) The appeal was denied as untimely at the November 7, 1999 membership meeting. (See Pl. Ex. 17, ¶ 20.) On December 3, 1999, Plaintiff Garrish wrote a letter to UAW President Steven P. Yokich, appealing the membership's decision to the UAW's International Executive Board. (See Pl. Ex. 17, ¶ 20.)

In an undated letter, which references a February 1, 2000 hearing, Gary Bryner, Administrative Assistant to President Yokich determined that Plaintiff Garrish had filed a timely appeal. (See Pl. Ex. 17, ¶ 21.) On March 19, 2000, the membership of Local 594 voted in favor of approving Plaintiff Garrish's appeal. (See Pl. Ex. 17, ¶ 22.) Thus, on May 10, 2000, Plaintiff Garrish again

wrote to President Yokich requesting that the International Executive Board consider his appeal. (See Pl. Ex. 17, ¶ 22.) In a letter dated January 17, 2002, Willie Williams, Assistant Director of the UAW's GM Department, concluded, after analyzing the merits of Plaintiff Garrish's appeal, that the local union acted properly in withdrawing the grievances. (See Pl. Ex. 17, ¶ 25.) On February 5, 2002, Plantiff Garrish appealed the decision of Mr. Williams to the International Executive Board, in care of President Yokich. (See Pl. Ex. 17, ¶ 26.) In a letter dated February 12, 2002, the President's office acknowledged receipt of Plaintiff Garrish's appeal. (See Pl. Ex. 17, ¶ 27.) As of the date of his affidavit, April 9, 2003, Plaintiff Garrish has not received a decision from the UAW President's office. (See Pl. Ex. 17, ¶ 28.)

Plaintiffs contend that the filing and appeal of these grievances tolled the statute of limitations. Defendants argue that Plaintiffs' grievances did not toll the statute of limitations because Plaintiffs knew or should have known that their grievances were futile. Defendants' argument is premised upon two primary contentions: (1) Plaintiffs knew or should have known that the Union was no longer adequately pursuing their grievances; and (2) Plaintiffs' claims in this lawsuit are beyond the scope of their grievances.

19

An employee must exhaust any grievance remedies provided under the collective bargaining agreement prior to bringing suit against an employer for a violation of that agreement. See Robinson v. Central Brass Mfg. Co., 987 F.2d 1235, 1239 (6th Cir. 1993). The statute of limitations begins to accrue when an employee had knowledge that the union has withdrawn his grievance. See Moore v. UAW Local 598, 33 Fed. Appx. 165, 167-68 (6th Cir. 2002); Noble, 32 F.3d at 1001 ("[T]he latest date at which plaintiffs should have known of the union's breach was in 1988 when the union steward refused to pursue their claim.); cf. Jones v. General Motors Corp., 939 F.2d 380, 384 (6th Cir. 1991) ("A decision by a union not to arbitrate a claim has been held to constitute an event that could trigger a plaintiff's knowledge of the acts constituting the violation."). Moreover, the statute of limitations is not tolled while an employee pursues internal union remedies that are completely futile. See Robinson, 987 F.2d at 1242; Howell v. General Motors Corp., 19 Fed. Appx. 163, 168 (6th Cir. 2001) (same). Rather, "in order for the statute of limitations to be tolled, the internal union appeal must be able to afford the claimant some relief from the defendant." Robinson, 987 F.2d at 1242. Finally, Courts have recognized that the filing of an unfair labor practice charge triggers the statute of limitations. See,

20

e.g., <u>Scott v. UAW</u>, 242 F.3d 837, 840 (8th Cir. 2000); <u>Simmons v.</u> <u>Howard Univ.</u>, 157 F.3d 914, 916 (D.C. Cir. 1998) ("An unbroken string of precedent supports the proposition that when a plaintiff accuses his union of a breach of the duty of fair representation in a charge filed with the NLRB, he has by then, as a matter of law, 'discovered' the grounds for his hybrid § 301 claim.").

Here, Plaintiffs have admitted that the pursuit of their grievances was futile. In their First Amended Complaint, Plaintiffs admit that the February 22, 1999 appeal of the withdrawal of their grievance was futile. (<u>See</u> Amend. Compl. ¶¶ 130-32.) Plaintiffs allege that "[t]he President's office of Defendant UAW referred Plaintiffs' appeal to UAW Vice-President Shoemaker," (<u>Id</u>. ¶ 132), the same person "who approved the violation of the National CBA," (<u>Id</u>. ¶ 135). Moreover, at his August 15, 2001 deposition in this matter, Plaintiff Garrish admitted that the pursuit of his grievances was futile:

> Q. So early on it was known that the union was not going ahead and letting you process that grievance?
>
> A. Yes. . . .
>
> Q. Yeah. I assume you had that suspicion probably when you started filing the grievance, did you not?
>
> A. Uh-huh, yes. And they confirmed every step of the way for me.

(Garrish Dep. 200.)

Plaintiff Garrish also testified that he was not surprised that his appeal of the withdrawal of his grievance was denied as untimely, stating, "I could have bet on that. I could have gambled everything I owned on it." (Garrish Dep. 206.)

Plaintiff Garrish attempts to recant his prior admissions in an affidavit prepared on April 9, 2003 and submitted with Plaintiffs' response to Defendants' motions for summary judgment. In this affidavit, Plaintiff avers: "In my deposition by the UAW and GM, I stated that in 1999 I felt that the UAW would not properly process my appeal. Nevertheless, I processed my appeal in accordance with the UAW's Constitution, and what, I believed, as a layman, to have been my obligations under federal law." (Pl. Ex. 17, ¶ 29.) Plaintiff further avers, "I was wrong in my belief in 1999 that my appeal would not be properly pursued by the President's office. Hence, I renewed my faith in my appeal receiving a just hearing and I continued with my appeal." (Id., ¶ 32.) Although Plaintiff Garrish attempts through his affidavit to recant statements that he made during his deposition, "it is well settled that a plaintiff may not create a factual issue for the purpose of defeating a motion for summary judgment by filing an affidavit contradicting a statement the plaintiff made in a prior deposition." Jones, 939 F.2d at 385. Thus, the Court will

22

disregard those statements in Plaintiff Garrish's affidavit that contradict his deposition testimony regarding the futility of the grievance process.

Thus, based upon allegations in the First Amended Complaint and the admissions of lead Plaintiff Garrish, the Court finds that Plaintiffs knew or should have known that the appeal of their August 1997 grievances was futile. Accordingly, the statute of limitations began to accrue as early as February 3, 1999, when the grievances were withdrawn, and Plaintiffs' subsequent attempts to appeal the withdrawal of those grievances did not toll the statute of limitations.

The limited scope of the grievances is further evidence that their filing did not toll the statute of limitations. As noted above, the August, 1997 grievances specifically challenged the qualifications of Gordon Campbell and Todd Fante and requested the removal of these individuals if in fact they were determined to be unqualified. In contrast, Plaintiffs admit in the First Amended Complaint that the National CBA's grievance procedure does not provide a remedy for their claims in this lawsuit:

> 122. The National CBA does not allow for payment to Plaintiffs for the 60 days wages they lost due to the collusion and fraud of all Defendants in Defendant Local 594's demand that Defendant GM wrongfully hire Defendants Campbell and Fante.

123. Plaintiffs have no Administrative Remedies regarding the 60 days lost wages while unknowingly on strike for the purpose of forcing Defendant GM to violate the National CBA.

124. Plaintiffs did not file a grievance for 60 days lost wages due to the fraud and collusion between Defendants UAW, Local 594, and GM to pay monies to union officials.

125. The National CBA does not have a provision in its grievance procedure for the processing of grievances alleging collusion and fraud between the union and management for 60 days lost wages due to a strike over improper issues that were secretly discussed and settled between Defendants UAW, Local 594, and GM.

126. Plaintiffs have no administrative remedies in which to recover their 60 days lost wages due to the collusion and fraud of all Defendants on the violation of the National CBA regarding Defendants Campbell and Fante, and due to the collusion and fraud of Defendants UAW, Local 594, and GM in wrongful payments to union officials.

* * *

136. The final step of the internal union appeal procedure is to either the Public Review Board ("PRB") or to the Conventions Appeal Committee ("CAC"), but not to both.

137. Defendant UAW Constitution does not grant the PRB, or the CAC, the authority to review and decide claims of fraud and collusion between itself and Defendant GM where Plaintiffs lost wages due to that collusion and fraud.

138. Neither the PRB nor the CAC can grant Plaintiffs any monetary relief for the 60 days lost wages during the 1997 strike.

(Amend. Compl. ¶¶ 122-26, 136-38.)

24

Through these allegations in the First Amended Complaint, Plaintiffs admit that their August 1997 grievances do not address the subject matter of this lawsuit. Plaintiffs' allegations are confirmed by the affidavit of Dottie Jones, Administrative Assistant to UAW President Ron Gettelfinger. In her affidavit, which is offered in the Union's reply brief, Ms. Jones avers:

> [I]f the CAC or PRB were to grant Garrish's appeal, they would reinstate Grievance Nos. C006889 and C006890 in the contractual grievance procedure of the UAW-GM National Agreement, to seek the removal of Fante and Campbell from their GM jobs as skilled trades journeymen. Since, as [Willie] Williams found on behalf of the UAW National GM Department, none of the grievants were denied a skilled trades job or suffered any financial injury as a result of the hiring of Fante and Campbell, the CAC and the PRB would not award monetary damages or have any basis for doing so.

(Union Reply, Ex. 2, ¶ 8.)

In this lawsuit, Plaintiffs do seek the removal of Fante and Campbell from the skilled trades. (Amend. Compl. ¶ 154.) Despite this similarity between the relief requested in the grievances and in the First Amended Complaint, the issues in this lawsuit are otherwise inapposite to the grievances. At the heart of this suit stand Plaintiffs' allegations that the Union improperly prolonged the strike in order to secure employment for Todd Fante and Gordon Campbell and payments for Union officials, and that GM violated the NCBA by acquiescing in these demands in order to settle the strike.

25

(See Amend. Compl. ¶ 157.) Plaintiffs allege that the prolongation of the strike caused members to lose 60 days of wages. (See Amend. Compl. ¶ 124). Plaintiffs seek $50,000,000 in compensatory damages, (Amend. Compl. ¶ 157), and $500,000,000 in punitive damages, (Amend. Compl. ¶ 158), on behalf of 5,000 employees, (Amend. Compl. ¶ 147).

The disconnect between Plaintiffs' August 1997 grievances and this lawsuit is manifest. Both seek the removal of Fante and Campbell from the skilled trades, but the similarities end there. Plaintiffs admit in the First Amended Complaint that the issues in this suit cannot be resolved through internal administrative channels. Plaintiffs admit that the relief they seek is beyond the scope of any internal administrative procedure. These admissions are confirmed by the affidavit of Dottie Jones. As noted above, "in order for the statute of limitations to be tolled, the internal union appeal must be able to afford the claimant some relief," and the statute of limitations is not tolled "while a claimant pursues completely futile internal union remedies." Robinson, 987 F.2d at 1242.

Here, Plaintiffs admit that their claims of strike prolongation and payoffs and request for lost wages and punitive damages could not be addressed through internal administrative

26

channels. Thus, Plaintiffs' August 1997 grievances, which sought merely the removal of Fante and Campbell, were completely futile as to the claims in this lawsuit and did not toll the statute of limitations.

As a final matter, the Court concludes that Plaintiff Janice Austin's filing of an unfair labor practice charge in June, 1999 is further evidence that Plaintiffs discovered the grounds for this hybrid Section 301 action prior to February, 7, 2000.

For the foregoing reasons, the Court finds that there is no genuine issue of material fact concerning Defendants' contention that this suit is barred by the six month statute of limitations. The statute of limitations began to accrue as early as February 3, 1999, and Plaintiffs knew or should have known through the exercise of reasonable diligence of the acts comprising their allegations that the 1997 strike was prolonged to secure employment for Todd Fante and Gordon Campbell.

### 2. Alleged Payoffs of Union Officials

At the outset, GM contends that Plaintiffs' counsel has conceded that the alleged payoffs that Union officials received from GM during the strike did not constitute a breach of contract. (See GM Ex. 1., Ltr. from Harold Dunne, May 24, 2002.) As noted above, despite this apparent concession, Plaintiffs continued to

27

pursue this claim in their response to the motions for summary judgment. For reasons set forth below, the Court finds that, even if the alleged payoffs are actionable in this Section 301 suit, Plaintiffs knew or should have known through the exercise of reasonable diligence that Union officials received such payments and that Union officials prolonged the strike in order to obtain such payments.

Defendants argue that Plaintiffs had knowledge of the alleged improper payments as early as August, 1997 and that knowledge of such payments was widespread no later than January, 1998. In response, Plaintiffs contend that they could not have known of such improper payments until at least the middle of 2000. In support of their argument, Defendants cite the leaflet distributed by Local 594 member Suzanne Brown in September or October, 1997, in which Ms. Brown wrote: "Jay Campbell bragged about the fact that he wrote a grievance for himself for $40,000 because he deserved it! . . . Bill Coffey received $60,000, because he deserved it!" (GM Ex. 13, Suzanne Brown Leaflet.) Defendants also cite the January, 1998 petition circulated among members of Local 594 that asserted that Shop Committee Chairman Jay Campbell and Skilled Trades Zone Man Bill Coffey had "misuse[d] the bargaining table during the '97 strike . . . [by] receiving grievance settlements that exceeded the

28

yearly incomes of some members . . . ." (GM Ex. 21.) Defendants note that between 500 and 2000 members of Local 594 signed this petition and that at least 72 Plaintiffs signed the petition. <u>See</u> GM Br. at 14; Union Br. at 16-17.)

In their response, Plaintiffs offer the deposition of Plaintiff Garrish. In his affidavit, Plaintiff Garrish avers that he was informed by Local 594 Committeeman Mike Fitch in either late July or early August 2000 that all Committeemen were paid $5,000 during the strike. (Pl. Ex. 17, Garrish Aff., ¶ 41.) Garrish also avers that, "[p]rior to Fitch's statement, I knew that Jay Campbell received about $40,000 in a grievance settlement, Bill Coffey received about $60,000 in a grievance settlement, and John Kolton received about $15,000 in a grievance settlement." (Pl. Ex. 17, Garrish Aff., ¶ 43.) Garrish also states that although he was aware of numerous leaflets distributed from late 1997 to mid-2000 questioning the validity of such payments, all three of these Union officials continued to assert that the grievance settlements were valid. (Pl. Ex. 17, Garrish Aff., ¶ 44.) Finally, Garrish avers that "I had no reason to believe that all Committeemen received improper payments from GM for their actions during the 1997 strike until Fitch told me that 'all Committeemen' received payments from GM at the end of the strike." (Pl. Ex. 17, Garrish Aff., ¶ 45.)

In reply, Defendants note that Garrish has admitted that he was aware of the payments made to Jay Campbell, Bill Coffey, and John Kolton.  Thus, Defendants argue, the fact that Garrish was allegedly unaware of <u>all</u> of the allegedly wrongful payments does not stop the running of the statute of limitations.  Next, Defendants argue that the overwhelming evidence in the form of leaflets and other documents distributed from 1997 through 2000 provide sufficient evidence from which the Court can conclude that, with the exercise of reasonable diligence, Plaintiffs should have known of the allegedly wrongful payments prior to February 7, 2000.

On balance, although Garrish's affidavit establishes that he did not know about the $5,000 payments to Mike Fitch and other Committeemen until July, 2000, he did know of the payments to other high level officials, <u>i.e.</u>, Jay Campbell, prior to July, 2000.  Moreover, the evidence offered by Defendants in the form of leaflets and other documentation suggests that allegations of improper "payoffs" were widely known as early as September, 1997.  <u>Cf</u>. <u>Bernard Schoninger Shopping Ctrs. Ltd. v. J.P.S. Elastomerics, Corp.</u>, 102 F.3d 1173, 1178-79 (11th Cir. 1997) (finding that knowledge of the first of a series of events triggers the statute limitations as to later occurring but related events).  For these reasons, the Court finds that there is no genuine issue of material

fact concerning Defendants' contention that Plaintiffs either knew, or should have known through the exercise of reasonable diligence, of the alleged payoffs made to Union officials prior to February 7, 2000.

### C. The Affidavit of Gerald McDonald

In its March 7, 2001 order, this Court denied without prejudice the motion for summary judgment filed by Defendants UAW, Local 594, Fante and Campbell, pending the close of discovery. However, the Court noted that lead Plaintiff Gerald McDonald had adduced evidence from which a reasonable jury could conclude that it was not until July, 2000 that he knew, or had reason to know, that union officials had prolonged the strike in order to obtain employment for Fante and Campbell, or that union officials had prolonged the strike in order to obtain payoffs. See Garrish, 133 F. Supp. 2d at 966. Specifically, the Court relied upon Mr. McDonald's January 10, 2001 affidavit, in which he

> state[ed] specifically that he was unaware of either allegation, and implies that he had no reason to be aware of either allegation because (1) "it was never reported at any Local 594 membership meeting" that the strike was prolonged to help Messrs. Fante and Campbell and (2) rumors of the $200,000 payment did not disseminate until a union official admitted to accepting a payment in the summer of 2000. (Aff. of Gerald McDonald, ¶¶ 11, 17-19.)

Garrish, 133 F. Supp. 2d at 966.

On August 16, 2001, Defendants deposed Mr. McDonald. In their

31

current motions for summary judgment, Defendants contend that Mr. McDonald contradicted his January 10, 2001 affidavit at his deposition and that the Court therefore should disregard Mr. McDonald's prior affidavit. For the following reasons, the Court agrees.

At his August 16, 2001 deposition, Mr. McDonald indicated that he was aware of the allegations of wrongdoing as early as 1997. For example, McDonald acknowledged that, after returning to work following the strike, the membership had serious questions about how two allegedly unqualified journeymen received jobs and why union officials received large grievance payoffs. (McDonald Dep. 54.) McDonald specifically acknowledged that the questions that arose after the strike concerned the journeymen jobs for Todd Fante and Gordon Campbell and the grievance payments to Bill Coffey and Jay Campbell. (McDonald Dep. 55.) McDonald confirmed that he had heard about these issues around July and August of 1997. (McDonald Dep. 55-56.) McDonald admitted that by September 1997, the hiring of Gordon Campbell and Todd Fante was a source of controversy in part because these individuals were related to members of the Independent Slate. (McDonald Dep. 16-17.)

McDonald testified that he heard Jay Campbell and Bill Coffey defending the grievance settlements that they had received out of

the 1997 strike.  (McDonald Dep. 38-39.)  McDonald acknowledged that members were questioning the propriety of the grievance settlements received by union negotiators, stating:

> No one was suggesting they did not have a right to those payments.  They were saying that it's peculiar that they got such big lump sums for a long strike that seemed to produce little else. . . . . [T]hat's a lot of money, don't you think?  It seems to me that that is an awful lot of overtime for two people to be getting, two people who are in a position – I mean, if I had a grievance and it was worth $60,000 and I wasn't at the bargaining table, there's not a chance in hell of me getting it.

(McDonald Dep. 39-40.)

McDonald acknowledged that it was "entirely possible" that union negotiators might have traded off something in order to obtain their large grievances settlements.  (McDonald Dep. 40.) McDonald testified that the fact that Jay Campbell and Bill Coffey "came out so defensively [about their grievance settlements] only lent itself to some sense of impropriety."  (McDonald Dep. 41.) McDonald testified that his "take" on the negotiators' defensiveness about their grievance settlements indicated that they had done something wrong.  (McDonald Dep. 41.)  McDonald acknowledged that he heard the defense of Campbell and Coffey's grievance settlements at the September 14, 1997 membership meeting. (McDonald Dep. 41.)

McDonald also testified that he had read and distributed most

33

if not all of the editions of <u>The Challenger</u> in 1997, 1998, and 1999. (McDonald Dep. 58-59, 65.) As noted above, <u>The Challenger</u> was an opposition newsletter by lead Plaintiff Gene Austin that directly questioned whether the members had been kept on strike so that Jay Campbell could secure employment for his son, Gordon Campbell. (<u>See</u> Union Ex. 33.) In the September 1997 issue of <u>The Challenger</u>, a letter questioned whether Bill Coffey had received a large grievance payoff. (Union Ex. 10 at 7.)

McDonald admitted that he signed the 1998 petition to remove Don Douglas. (McDonald Dep. 75-76.) As noted above, this petition alleged that the Chairman of the Shop Committee and the Skilled Trades Zone Man had "misuse[d] . . . the bargaining table during the '97 strike" in order to "receiv[e] grievance settlements that exceeded the yearly incomes of some members" and had "bargain[ed] to get relatives hired who had been declared unsuitable by management." (GM Ex. 21.; Union Ex. 22.)

The Court finds that the foregoing excerpts of Mr. McDonald's deposition testimony in many respects contradicts Mr. McDonald's prior affidavit, relied upon by the Court in its March 7, 2001 order denying Defendant's motion for summary judgment without prejudice. Mr. McDonald's deposition testimony strongly indicates either that he knew, or at least should have known through the

34

exercise of reasonable diligence, of the allegations relating to the hiring of Fante and Campbell and the payoffs received by union officials long before February 7, 2000. Accordingly, based upon subsequent discovery, and specifically Mr. McDonald's deposition testimony, the Court shall disregard Mr. McDonald's June 10, 2001 affidavit and finds that affidavit insufficient to create an issue of fact for the jury. Cf. Jones, 939 F.2d at 385 ("[I]t is well settled that a plaintiff may not create a factual issue for the purpose of defeating a motion for summary judgment by filing an affidavit contradicting a statement the plaintiff made in a prior deposition.").

D.   The Deposition of Jay Campbell

Plaintiffs deposed Jay Campbell on February 18, 2003. Mr. Campbell, who is currently under indictment, exercised his Fifth Amendment privilege in response to virtually every substantive question posed by Plaintiffs' counsel at the deposition. Plaintiffs argue that, despite the fact that Mr. Campbell did not provide any substantive answers, the Court may draw adverse inferences against Defendants based upon Mr. Campbell's "non-answers."

The Second Circuit has outlined several non-exclusive factors that a court should consider when deciding whether to draw adverse

inferences from a non-party's invocation of the Fifth Amendment privilege against self-incrimination in the course of civil litigation:

> 1. <u>The Nature of the Relevant Relationships</u>: While no particular relationship governs, the nature of the relationship will invariably be the most significant circumstance. It should be examined, however, from the perspective of a non-party witness' loyalty to the plaintiff or defendant, as the case may be. The closer the bond, whether by reason of blood, friendship or business, the less likely the non-party witness would be to render testimony in order to damage the relationship.
>
> 2. <u>The Degree of Control of the Party Over the Non-Party Witness</u>: The degree of control which the party has vested in the non-party witness in regard to the key facts and general subject matter of the litigation will likely inform the trial court whether the assertion of the privilege should be viewed as akin to testimony approaching admissibility under Fed.R.Evid. 801(d)(2), and may accordingly be viewed . . . as a vicarious admission.
>
> 3. <u>The Compatibility of the Interests of the Party and Non-Party Witness in the Outcome of the Litigation</u>: The trial court should evaluate whether the non-party witness is pragmatically a noncaptioned party in interest and whether the assertion of the privilege advances the interests of both the non-party witness and the affected party in the outcome of the litigation.
>
> 4. <u>The Role of the Non-Party Witness in the Litigation</u>: Whether the non-party witness was a key figure in the litigation and played a controlling role in respect to any of its underlying aspects also logically merits consideration by the trial court.

<u>LiButti v. United States</u>, 107 F.3d 110, 123-24 (2d Cir. 1997). While consideration of the above factors is important, "the overarching concern is fundamentally whether the adverse inference

is trustworthy under all of the circumstances and will advance the
search for the truth."  Id. at 124.

Analyzing the present situation under the first two factors,
nature of the relationships and degree of control, it is not clear
whether the Court should draw adverse inferences against Defendants
GM and the Union.   First, there is a difference in Campbell's
former relationship with each of the Defendants.   Obviously, as a
former union official, Campbell's interests were often at odds with
GM's interests.   Moreover, GM did not exercise control over
Campbell.   On the other hand, Campbell was a Union official and
thus had a direct relationship with the Union.

The third factor, compatibility of interests, favors the
conclusion that adverse inferences should be drawn from Campbell's
invocation of the privilege.   It is clear that Campbell has an
interest in the dismissal of this lawsuit, as the ultimate issues
of liability involve his allegedly wrongful conduct.   Moreover,
under the fourth a factor, it is clear that Jay Campbell was a key
figure in the underlying facts of this lawsuit.

Accordingly, on balance, the above factors tend to favor the
drawing of adverse inferences against Defendants based upon Jay
Campbell's invocation of the Fifth Amendment privilege against
self-incrimination.   However, even if the Court were to draw such

37

inferences, the Court concludes that Plaintiffs' reliance upon such inferences, without more, will not save them from summary judgment on the statute of limitations issue.

The vast majority of the questions put to Jay Campbell at his deposition do not implicate the statute of limitations. Many of the "inferences" that Plaintiffs request are pure legal conclusions, such as that Plaintiff Garrish's grievances were timely. The most powerful inferences that Plaintiffs could hope to draw from the deposition of Jay Campbell are (1) that Jay Campbell concealed from the membership the facts that he had prolonged the strike in order to obtain employment for his son and to obtain payments from GM; and (2) that the membership had reason to believe that Jay Campbell's denials of allegations of such conduct were trustworthy. These inferences, however, do not overcome the overwhelming evidence that Plaintiffs knew, or should have known through the exercise of reasonable diligence, of the acts giving rise to their cause of action prior to February 7, 2000. For these reasons, the Court finds Jay Campbell's deposition testimony of little if any value to the issues now before the Court. This testimony is insufficient to create an issue of fact for trial.

IV. CONCLUSION

Accordingly, this Court being fully advised in the premises,

38

IT IS HEREBY ORDERED that Defendants' motions for summary judgment on the statute of limitations issue [docket entries 87 & 91] are GRANTED and this case is dismissed.

SO ORDERED.

Dated: _SEPT. 24, 2003_

_Paul V. Gadola_
_____
HON. PAUL V. GADOLA
UNITED STATES DISTRICT JUDGE

PURS_____P
COPIE_____:
_all counsel_
_of record_
_____
_____
ON: _4/24_, 2023
_____
DEPUTY COURT CLERK

39